\* EDWARD ST. LOE LIVERMORE, Assignee of EDMUND BARTLET, JUN., a Bankrupt, *versus* THE NEWBURYPORT MARINE INSURANCE COMPANY.

*The insured must give reasonable notice of his intention to abandon, to the insurers ; otherwise he waives his right to abandon. Held that the insured, who were informed on the 17th of October of the detention of their ship by the British for attempting to enter a blockaded port in France, and did not give notice of their intention to abandon till the 20th of November following, had waived their right to abandon, such notice not being reasonable notice.*

ASSUMPSIT on a policy of insurance, for a total loss, which was stated in the declaration to have happened, by the ship and cargo being attached, arrested, taken, detained, and carried away to *Portsmouth*, in *Great Britain*, by a *British* frigate. The cause was submitted to the Court upon the following state of facts, *viz.*, That the defendants made and subscribed the policy of insurance described in the plaintiff's declaration. (This was annexed to, and made part of, the state of facts, bore date the 25th day of July, 1801, and was, in substance, that the president and directors of the *Newburyport Marine Insurance Company* caused *Edmund Bartlet, Jun.*, to be assured, lost or not lost, the sum of 16,000 dollars on the schooner "*Five Sisters*" and cargo, from *Newburyport* to, at, and from any ports or places in *Europe*, and back to the *United States*, for twelve months from the 15th day of the present month, 5000 dollars of which is on the schooner and appurtenances, valued at the same ; the residue on the cargo, with liberty to withdraw this policy at any time after six months ; whereof is master, for this present voyage, *Joseph Lunt*. With the usual clause of insurance against *takings at sea, arrests, restraints, and detainments of all kings, princes, or people, of what nation, condition or quality soever.*) That, at the time of signing the said policy, the said *Edmund Bartlet*, the bankrupt, was interested in the schooner "*Five Sisters*," agreeably to the charter-party made between *Oliver Osgood*, the owner, and the said *Bartlet*. (The charter-party was annexed to, and made part of, the state of facts ; and thereby *Osgood* let the schooner to freight to *Bartlet*, for a voyage from *Newburyport* to any parts or places in [ \* 265 ] \* *Europe*, and back to *Newburyport*, at ———— per month.) And that said *Bartlet* was also interested in the cargo on board said vessel to the amount of the sum insured thereon. That the said schooner, with the cargo on board, sailed from *Newburyport*, bound to *Havre de Grace* and a market, on the 16th day of *July*, 1801, and on the 23d day of *August* next follow-

LIVERMORE *vs.* NEWBURYPORT MARINE INSURANCE COMPANY.

ing, was captured by a *British* frigate, and carried into *Portsmouth*, for attempting to enter into *Havre de Grace*, which was then blockaded by a *British* force, but of which the assured *or* captain of said schooner were wholly ignorant, and was there detained until the 28th day of November following, when the schooner and cargo were restored to the captain, by the order of the *British* government ; and after waiting for his papers until the 5th day of December then next, he, on that day, departed, and arrived at *Havre de Grace* on the 15th day of the same month, and there sold her entire cargo, agreeably to the account of sales annexed, (*a*) signed *Joseph Lunt* ; and on the 21st day of March following, sailed for *Rotterdam*, where he arrived on the —— day of said March ; and after purchasing a cargo at *Rotterdam*, he sailed for *Newburyport*, and arrived there on the 26th day of May, 1802.   That, on the 30th day of August, 1801, *Lunt* wrote the letter annexed—(This letter was directed to *Bartlet* from *Lunt*, giving notice of the capture of the schooner by the *British* frigate, and stated that he, *Lunt*, expected the vessel would, in a short time, be released)—and that *Bartlet* received the letter on the 17th day of October following ; that, on the 16th day of November, 1801, intelligence was received at *Newburyport*, where said *Bartlet* lived, of the peace concluded between *Great Britain* and *France* ; that said *Bartlet* was not in *Newburyport* for two or three days next before * the said 20th of [ * **266** ] November ; and, on the said 20th day of said November, the said *Bartlet*, at the defendant's office, made the offer of abandonment as annexed, and claimed as and for a total loss—(The offer of abandonment was as follows, viz. :—" *Newburyport*, Nov. 20th, 1801.   The subscriber having received information of the capture of his schooner ' *Five Sisters*,' Capt. *Joseph C. Lunt*, by an *English* frigate, and detained with her cargo at *Falmouth*, (*b*) in *England*, abandons to the *Newburyport* Marine Insurance Company all his right, title and interest in and to the said schooner and cargo, so far as the same was insured by them, and claims of said company as and for a total loss.   *Edmund Bartlet, Jun.*")   That the offer was made to the *president* of the company, and entered upon the books of the said company ; and at that time the president informed said *Bartlet* that it was uncertain whether it would be accepted, and in two or three days afterwards the said *Bartlet* was informed, by order of said company, that the abandonment would not be accepted.   That a letter from *the captain*, dated September 29th, 1801, covering the protest, was received on

(*a*) The particulars not material as to the points in the case.
(*b*) *So* in the original.

the 2d day of December following, by the said *Bartlet,* and, immediately upon the receipt, were both left at the defendants' office; that on the 28th day of the same December, the said *Bartlet* made and delivered to *W. P. Johnson* a bond for securing a debt due to said *Johnson,* and at the same time executed a bill of sale of all the said cargo, with the invoice and bill of lading thereof annexed, and also assigned the said policy to said *Johnson* as by the endorsement thereon, both being as collateral security for said bond, that, upon receiving the same, the said *Johnson* deposited the assign-

[ * 267 ] ment of said policy in the defendants' office, and in- formed the *company* that the property of the * said cargo was made over to him, and that in case of loss they must be accountable to him, and not to said *Bartlet;* that the said schooner, with a return cargo, arrived safe in the harbor of *New- buryport* about the last day of May, 1802, and that immediately upon her appearing in the *river,* the said *Johnson* sent a pilot on board, and took possession of her to his own use, by virtue of said bill of sale, and kept possession. That, before the vessel came to the wharf, the *captain* came on shore, and delivered the papers to said *Bartlet;* that while the schooner and cargo were in said *Johnson's* possession, application was made to him by the defendants to know whether, in the event of their accepting the abandonment made as aforesaid, he would release his claim to said vessel and cargo, and that the said *Johnson* expressed his willingness to do it upon his first receiving his debt due from said *Bartlet,* being about 6000 dollars, and not otherwise. That, on the 28th day of May, 1802, an application was made to said *Bartlet,* by order of the defendants, by *W. Woart,* which is expressed in said *Woart's* certificate annexed—(*Woart's* certificate is, that, on the 28th day of May, 1802, he, with *Ch. Jackson, Esq.,* by the desire of the directors of the company, the defendants, waited on *Bartlet,* at *Johnson's* store, to tell him that the directors were considering of his offer to abandon the vessel and cargo, and wished him to say, if they accepted his offer to abandon, and paid him a total loss, what transfer he would make of the vessel and cargo, and how they should be secure in holding the property. He assured us repeatedly that he could and would make a complete and satisfactory transfer. We then observed to him that, as the vessel belonged to Mr. *Osgood,* and the cargo on board was assigned to Capt. *Johnson,* and part had been remitted to Mr. *Dickason,* of *London,*

[ * 268 ] the directors wished to know particularly * how he would transfer all of this with safety to them, and desired him to make out such papers as he was willing to execute. He said that Mr. *Osgood* was willing, upon terms which they had

202

settled, to give up the vessel, and that he had agreed to do so about eight or ten days ago, but two days before the vessel arrived here. We told him that Mr. *Osgood* (as we had understood) would not give up his vessel to the underwriters, unless he was compelled by law to do it. He then said he would see Mr. *Osgood*, and when he had determined what he could do, he would call on Mr. *Jackson*, and get him to prepare such papers as he, Mr. *Bartlet*, should be willing to execute. This conversation was in the presence of *Johnson*, who answered that, in any event, he should expect to be made secure.) That said *Bartlet* never afterwards applied to said *Johnson* for the purpose mentioned in the foregoing certificate, but, on the same day, went with said *Osgood* to the office of the defendants, who offered to relinquish his claim to said vessel on receiving from said office payment of his demand, which was about 5000 dollars, *viz.*, the value of the vessel, and the charter-hire then due, and execute any papers necessary for that purpose; that, on the first day of June following, the parties agreed that the said cargo should be sold by said *Johnson*, and the defendants should take no advantage of the sale in any legal question which might arise between the parties, and that the same was accordingly sold by said *Johnson*, the net proceeds whereof amounted to —— dollars. That the amount of expenses arising from the detention of said schooner in *England*, except *demurrage*, 9911 *livres*, 13 *sols*, being about —— dollars; that the whole amount of damage received was in the *cotton*, that all the damaged cotton was upon deck, and the quantity damaged was 4581 lbs.; and that the difference between the * sales of the good and damaged is stated in the [ * **269** ] account of sales of *Joseph Lunt* annexed to the case.

But that, if said vessel had not been captured, but had arrived safe, the cargo would have sold at the difference of one third more for the cotton, and fifty per cent. for sugars, and in the same proportion for other articles. That the said *Lunt* remitted from *Havre de Grace* to *T. Dickason*, of *London*, for account of said *Bartlet*, out of the proceeds of said cargo, the sum of 23,100 *livres*, being about 4400 dollars. That a commission of bankruptcy issued against the said *Bartlet* on the 24th day of September, 1802, and he was thereupon declared bankrupt, and that the plaintiff was duly appointed his assignee.

And if, on the foregoing state of facts, the Court shall be of opinion that the plaintiff is entitled to recover as for a total loss, the defendants agree to be defaulted, and that the Court may appoint assessors to assess the damages due as for a total loss. But if the Court shall be of opinion that the plaintiff is entitled to recover for a partial loss only, the defendants agree to be defaulted

and that the Court may appoint assessors to assess the damages for a partial loss. And in either case, judgment, being rendered upon the report of said assessors, shall be final between said parties.

> *Edward St. L. Livermore.*
>
> *Ch. Jackson* for defendants.

On the part of the plaintiff, it was insisted that he had a right to recover as for a total loss; that capture, or an arrest of princes, is *primâ facie* a total loss; and immediately upon the capture, or upon a mere arrest, or *at any time* while the ship continues under detention, the insured may elect to abandon, and give notice thereof to the insurer, and thus entitle himself to claim as for a total loss; that it appeared, by the state of facts, that the vessel [ * 270 ] *was captured on the 23d day of August, 1801, and was detained until the 28th day of November following; that the insured, on the 17th day of October, 1801, having received notice of the capture and detention of the vessel, had, from that time, so long as the detention continued, a right to consider the loss as total, and to abandon as for a total loss; and having elected to abandon, and notified the insurers thereof on the 20th of November, while the vessel was detained by the captors, it was clear he was entitled to recover as for a total loss; that while the detention continued, it was, in legal estimation, a continuance of the total loss; and that no case can be produced in which it has been decided that, while the loss continues total, the assured may not *at any time* abandon. *Marshall*, 439, 483, 495.

For the defendants, it was argued that the policy itself was illegal, the voyage insured being from *Newburyport*, to, at, and from any ports or places in *Europe*, without exception of blockaded ports and places. But whether so or not, it appearing from the state of facts that the capture was for an attempt to enter a blockaded port, which, by the law of nations, is an illegal act, a capture for such cause is not one of the perils insured against; and although, by the *British* treaty, the law of nations upon this subject has, as it respects the citizens of the *United States* entering a port blockaded by the *British* government, been altered in favor of *our* commerce, (under *that* treaty, notice of the blockade being necessary to justify the capture and detention of *American* ships,) yet the Court would presume that the assured had notice of the blockade of *Havre de Grace*, because, as was contended, the state of facts does not necessarily negative such knowledge in the insured. The state of facts says only " *but of which the assured or captain were wholly ignorant* " (The Court said, that, although

*the expression, which was obviously intended to [ * **271** ] negative the knowledge of the assured *and* captain, was

not so precise as it might have been, yet they would not presume criminality but from necessity.)—*Counsel*—But at any rate, it is insisted that the plaintiff, in this case, is entitled to recover for a partial loss only. It is true, that, in *Marshall*, 483, cited by the counsel for the plaintiff, it is laid down in general terms that, at any time while the ship continues under detention, the insured may elect to abandon. He cites no authority, nor was it necessary ; for, as a *general principle*, it will not be contested. But it ought, perhaps, to be noticed that he is there, in *that* section of the chapter on abandonment, stating " in *what cases* the insured may abandon." In the next section of the same chapter, he goes on to state " within *what time* the insured may abandon ;" and in this section, in p. 508, *he says*, " The rule is, that, as soon as the insured receives advice of a total loss, he must make his election whether he will abandon or not. If he determine to abandon, he must give the underwriters notice of this *within a reasonable time* after the intelligence arrives ; and any unnecessary delay in giving this notice, will amount to a waiver of his right to abandon, &c. ;" and in the subsequent pages the decided cases as to this rule are stated. The meaning of the several sections, so far as they respect the point under consideration, taken together, is, that *whenever* the insured may happen to receive notice of the capture and detention of his vessel, he may elect to abandon as for a total loss, giving notice thereof within a reasonable time to the insurer. In the case now before the Court, it is contended that this notice was not given within a reasonable time. The assured had, on the 17th day of October, notice of the capture and detention of the vessel and cargo. Residing in the same town in which the defendants kept their office,

*and therefore having it in his power to give immediate [ * **272** ] notice to the defendants, (as he did afterwards in the

case of the protest which he received on the 2d of December, and left *immediately* in the office of the defendants,) he lies by, neglects to give notice till the 20th of November, thirty-four days after the receipt of the letter from the *captain*, and then came forward with his offer of abandonment. Was this within a reasonable time ? Is there any reason *stated* for the delay ? None. Probably, however, there existed a reason in the mind of the assured. From the contents of the letter giving notice of the detention, he expected that the vessel would in a short time be released, in which event he undoubtedly calculated that he might still make a profitable voyage ; but upon the very unexpected news of a peace having been concluded between the belligerent powers in *Europe*, he, within four

18

days from the receipt of the intelligence, (for the purpose, undoubt-. edly, of avoiding a loss from the fall of the market,) gives the defendants notice of the capture, and makes his offer of abandonment. This was resisted by the defendants on the ground that the insured, by his neglect, had waived his *right* to abandon ; and upon grounds, as his counsel believe, not only just and equitable, but strictly legal.

But even if the abandonment was at first legal, it was contended that the subsequent conduct of the insured shows clearly that he had waived the abandonment. That a person may lose the benefit of an abandonment, though made within a reasonable time, if the right is not properly pursued, is proved by the decision of the fourth point in *Hamilton* vs. *Mendez*, 2 *Bur. Rep.* 1198. In the present case, the action was not commenced till the 27th day of November, 1802, at which time there was a partial loss only. The plaintiff's

[ * 273 ] demand is for an indemnity. His action, then, must be * founded on the nature of the indemnification as it really was at the time of the action brought. *Marshall,* 494.

To enable the plaintiff to recover as for a total loss, the action ought to have been brought while the total loss continued. His delay to bring the action amounts to at least an *implied* waiver of the abandonment. Stronger still is the other conduct of the insured. After the protest, *viz.,* the 28th of December, 1801, the insured transferred his property in the cargo to *Johnson,* and acted in every respect as if he were the owner ; and although the assignment of the goods was conditional, *viz.,* as collateral security for the bond he gave to *Johnson,* it can make no difference ; for, whether the assignment was absolute or conditional, here was such an interference, such a claim of right, as is wholly inconsistent with the pretensions now made of abandonment, which, if it ever existed, is *expressly* waived by these acts of the insured himself. Besides, immediately upon the arrival of the vessel, the assignee, *Johnson,* took and held the possession of the vessel and cargo by virtue of the assignment, and with the knowledge and consent of the insured.

In reply, it was insisted that the offer to abandon was made when the insured had a right to abandon, and that no subsequent conduct of *Bartlet* amounted to a waiver of the abandonment ; that, in this case, the vessel and cargo, at the time of the offer to abandon, remained under detention in the same situation in which they had been from the time they were carried into *Portsmouth,* and therefore that the cases cited from *Marshall,* by the counsel for the defendants, did not apply, because, in all those cases, the situation and circum-

stances of the property had been changed. Suppose the letter of *Lunt* had not been received until the 20th of November, the day on which the abandonment was *made. No [ * 274 ] one would have contended that the assured could not abandon. Why? Because the situation remained. There was no alteration in the circumstances. The insured had given *war premiums* for the insurance. He had the expectation, and has the right to the benefits which might result to him from the *then* state of *Europe*. He paid accordingly, and therefore ought to receive accordingly. Receiving the information of the capture at the time he did, he had a right to wait in hope of getting the *war price* for his cargo; because he had given the *war premium*. As to reasonable notice, it is contended that, while the captured remained in the same situation precisely, while the total loss continues, it is absurd to say that the notice must be given in reasonable time. Under such circumstances, every time is reasonable, and one time as reasonable as another. In all the cases which have been cited by the counsel for the defendants, as decided on this point, it appears that the notice given was after a change of the situation or circumstances of the property; and all that is determined is, that notice at such time is not reasonable notice.

The construction advocated by the counsel for the defendants would operate against underwriters, instead of operating in their favor; because, if the insured must, immediately after he has received notice himself, give notice to the insurer, and abandon, or not abandon at all, there would be an end to all attempts of the owner to recover the property, which would, in all cases where a right to abandon might exist, throw a total instead of a partial loss on the underwriters.

As to the waiver of the abandonment by the assignment of the property to *Johnson* for the security of a debt, what is the operation of it? It was not binding on the underwriters. *Bartlet* could not convey to any one so as to take away the right of the insurers. They had a *lien* on the goods. By *the abandonment, they had the right; and no sub- [ * 275 ] sequent act of *Bartlet* could divest them of that right. As to the vessel, *Bartlet* had an insurable interest in it, though he did not own the vessel. It is true, he could not abandon the vessel; but he could insure his interest in it, and could abandon that interest. As to the money in *Dickason's* hands, it belongs to the underwriters. By the abandonment, he became their agent.

The conduct of the underwriters themselves in May and June

1802, shows that they did not consider the abandonment as waived.

As to the neglect to bring the action, the counsel said he considered the objection too frivolous to notice.

He concluded by saying that, if the capture or detention continue, the assured has à right to abandon. If there be a recapture, or the vessel is released from her detention, and the voyage is not worth pursuing, the assured may also abandon. And these two positions would take up all the cases of abandonment grounded on capture.

SEWALL, J. (after stating the case.) The plaintiff contends that, under these circumstances, as assignee of *Edmund Bartlet's* effects, he is entitled to recover against the insurers of the schooner *Five Sisters*, and cargo, according to the policy declared on, their entire subscription, as for a total loss. And for this purpose, he argues that *Edmund Bartlet,* upon the capture of the schooner and cargo, and the interruption of the voyage insured, and by his offer, in consequence, to abandon to the insurers, had vested in them his interest in the vessel and cargo, and that the restoration thereof, and the prosecution and accomplishment of the voyage insured, must be taken to be for the benefit and account of the insurers, and at their risk.

That by certain events of the voyage, and at a [ * 276 ] particular period of the risk undertaken by this *policy, there had accrued to the insured a right of abandoning the effects and voyage insured, and of entitling himself thereby to recover as for a total loss against the insurers, seems to be admitted on *their* part; and this dispute has been brought, in the discussion of it, to this principal question—Whether the insured, according to the facts stated, had suitably availed himself of his right of abandonment, and had exercised that right in a manner to entitle himself, or the plaintiff as his representative, to recover as for a total loss against the insurers.

The seizure and detention of the vessel and cargo, and the in terruption thereby of the voyage insured by this policy, according to the state of facts, was constructively a total loss, at the election of the insured. The insured was not obliged to abandon; though to be entitled to recover as for a total loss he must abandon to the insurers the effects and voyage insured. The right of recovering a total loss accrues to the insured upon one event within the perils undertaken by the policy; his election, therefore, must be decided by this event as soon as it is known. To extend his election beyond

this period woulc subject the insurer to perils not undertaken by his contract. It might be concluded, therefore, upon obvious principles of reason and justice, if it had not been decided by legal authorities, that the insured, in exercising this right of election upon an event which may enable him to recover as for a total loss, has no privilege of delay. The law is, however, settled upon the subject. It is explicitly stated by *Marshall* as having been established; and the rule laid down by him is recognized in the case of *Mitchel* and *Edie*, and forms the principles of that decision. (*a*)   This rule is, " that as soon as the insured receives advice of a total loss, he must make his election * whether he will abandon or [ * **277** ] not ; if he determines to abandon, he must give the underwriters notice of this *within a reasonable time* after the intelligence arrives; and any unnecessary delay in giving this notice will amount to a waiver of his right to abandon."

It has been urged, in the argument for the plaintiff, that the election by the insured and his right of abandonment continues so long as the loss continues total; that is, during the detention or other event, which, at the election of the insured, may be construed a total loss. And to this purpose, a passage is cited from *Marshall*, (*b*) where, under the head, " In what cases the insured may abandon," and in specifying the case of capture and arrest of princes, his words are—" Capture by an enemy, or a pirate, or an arrest of princes, or even an embargo, is *primâ facie* a total loss; and immediately upon the capture, or upon a mere arrest, *or at any time while the ship continues under detention, the insured may elect to abandon.*"

This supposed contradiction of the rule before cited is very easily reconciled with it by considering the passage last cited as relating to the *right* of abandoning, which in a case of capture and detention may exist only during the detention ; according to the decision in the case of *Hamilton* vs. *Mendez*, 2 *Burr.* 1198. But the rule respecting the *manner* of exercising that right is too well established to be shaken or rendered in any degree doubtful by the mere statement of an author, without any adjudged case to support it, and which is certainly capable of a sense inapplicable to the present question.

Taking the rule applicable to this case to be as before cited, and according to the decision in the case of *Mitchel* and *Edie*, it remains to compare * with this rule the facts [ * **278** ] of the case before us, in the statement agreed by the

(*a*) *Marshall on Insurance*, 508, 509.—1 *Term Rep.* 608.
(*b*) Page 483

parties. In this inquiry the material facts are—On the 23d of August, 1801, the schooner *Five Sisters*, and cargo, were captured. Oct. 17th, *Edmund Bartlet*, the insured, received information of his loss by the letter of the captain, dated August 30th. On the 16th of November, intelligence was received at *Newburyport* of the peace concluded between *Great Britain* and *France*. On the 20th of November, *Edmund Bartlet* first made his election, and offered to abandon.

One can hardly imagine a concurrence of facts where the waiver of the right to abandon, and the right of the insured to reject an abandonment, can be more perfectly established than in this instance. The delay of the insured in point of time was unreasonable, and a waiver of his right; the change of circumstances intervening after his knowledge of the event which entitled him to abandon, and before his undertaking to exercise that right, gave the insurer a just right to reject the abandonment. The truth is, that Mr. *Bartlet* carried his speculation too far; and the event in this instance discovers, very strikingly, the justice and equity of the rule by which an attempt of this kind may be resisted.

It has been further urged in this case, that the insurers were answerable for a total loss; because the voyage insured became, after the detention suffered, not worth pursuing. To this argument, however ingeniously stated, there is a very obvious and satisfactory reply. This was not an insurance of profits; the insurers had not engaged that the insured should have a profitable voyage, or that the vessel should arrive seasonably. The fall of the market might have been thrown upon the insurers by an abandonment, but the insured chose to keep to himself the chance of the market, while [ * 279 ] a hope could be retained respecting it. The * chances of gain and loss must be kept together; and the rule I have cited certainly defeats this attempt of separating them to the injury of the insurer.

I have not adverted to several of the facts stated, which seem applicable to the question whether an abandonment had been made in this case; being clear in the opinion that, under the circumstances which I have noticed, the insured had no right to abandon, and that the insurers are answerable only for a par tial loss.

SEDGWICK, J. The question submitted to the determination of the Court, is, whether, upon the state of facts, the plaintiff is en titled to recover as for a total loss, or for a partial loss only. Total loss is of two kinds. *First*, it signifies the total destruction of the thing insured. And, *secondly*, such damage to the thing insured

though it may specifically remain, as renders it of little or no value to the owner. The cases stated in *Marshall*, 414, 433, are instances of what amounts to a total loss in the *legal sense* of the words; in all which the insured has a right, under the particular circumstances, to abandon and proceed against the insurer as for a total loss. In the case before us, the insured, undoubtedly, *once* had the right of abandoning and claiming damages from the insurers for a total loss And the only point in the case upon which I gave an opinion is, whether the insured has not waived his right of abandonment by his delay; by his not giving notice of his election and making the offer to abandon within a reasonable time after he had information of the capture and detention of his vessel. Notice must be given in all cases where it may be a benefit, or the want of it detrimental to the insurer. And the rule, as laid down by *Marshall*, (p. 508,) is, " that as soon as the insured receives notice of a total loss, he must make his election whether he will * abandon [ * 280 ] or not. If he determines to abandon, he must give the underwriters notice of this *within a reasonable time* after the intelligence arrives; *and any unnecessary delay in giving this notice will amount to a waiver of his right to abandon.*" This rule has not only been long established by legal decisions, but is manifestly just and equitable in itself; and the reason why the insured must make his election speedily, whether he will abandon or not, is, that the under writers may be put in a situation to do what is necessary for the preservation of the property. If this be so, and if it be true that, in the case before the Court, important knowledge was withheld, unreasonably withheld, then it is decisive of the merits. Was reasonable notice given? Was the knowledge important which was delayed to be communicated? On the 17th of October, the insured received notice of the capture and detention of the vessel and cargo; he makes no communication of the fact to the insurers until the 20th of November. No excuse is given for this delay, but that it might possibly be of more advantage to the underwriters; this was speculating on *his own* interest instead of acting for *their* benefit. Had notice been seasonably given, the underwriters might have appointed an agent to take care of the property for them. This they would have been entitled to do; and to give them the utmost advantage which might result from such appointment, the rule has been wisely established that they should have speedy notice that the property has become their own. As the insured in this case did not exercise his right of abandonment by giving notice, within such time as he might, without any inconvenience to himself, have given it,—for it might have been given *immediately* after he received infor

mation of the capture,—and as no reason is assigned for this delay, I am clearly of opinion that the notice cannot be consider-
[ * 281 ] ed *as given *within a reasonable time ;* but that there was an unnecessary delay, which amounted to a waiver of his right to abandon ; that, therefore, the insurers had a right to resist the offer, and consequently that the plaintiff is entitled to recover for a partial loss only.

DANA, C. J. The question is, whether the plaintiff is entitled to recover for a *total* or only for a *partial* loss. When the insured had information of the capture and detention of the vessel and cargo, he had undoubtedly a right to abandon to the insurers, and call upon them as for a total loss ; and the real question is, whether the insured, by his subsequent conduct, has not waived his right of abandonment. How then are the facts ? The insured has notice of the capture ; this knowledge he retains for thirty days, makes no communication to the insurers of the fact ; then comes the very unexpected intelligence of a peace having been concluded between *Great Britain* and *France*, and he immediately gives notice to the insurers of the capture, and makes his offer to abandon. Why was this neglected so long ? Probably because from the contents of the letter from the *captain* giving notice of the capture and detention of the vessel and cargo, he expected that they would soon be released, and that he should make a profitable voyage. This expectation being defeated by the news of a peace, he turns about and makes his claim upon the insurers for a total loss. It has been said that the right of the insured to abandon remains while the loss continues total : this is *generally* true, but the rule is subject to some restriction ; it supposes that no alteration has taken place in the circumstances of the case ; but the principle of all the authorities, upon the subject of abandonment, is, that the insured shall, within a reasonable time, communicate to the insurers any knowl-
[ * 282 ] edge which he has relative to the situation and *circum-stances of the property insured. This was not done in the present case ; and it is upon this ground only that the Court give their opinion, *viz.,* that the insured did not within a reasonable time give notice, and offer to abandon, and that by his neglect he waived the right of abandonment. My own opinion is, that the question whether the loss be partial or total may always be determined by the state of the case at the time of the commencement of the action. *Marshall,* 494. At the time of the commencement of the present action, the loss was not total ; because, previous to that time, the vessel and cargo had been restored ; but, without recurring to that, it is sufficient that the Court are all of opinion

that in this case the offer to abandon was not made within a reasonable time after notice of the capture, and, therefore, that the plaintiff is entitled to recover only for a partial loss.

*Parsons* for the plaintiff.

*Dexter* and *Jackson* for the defendants. (1)

(1) Vide post, vol. ii. p. 232, S. C